# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF IDAHO

_____

In Re:

Silva Dairy, LLC,

                              Debtor.

Bankruptcy Case
No. 10-41484-JDP

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

Steven L. Taggart, MAYNES TAGGART, PLLC, Idaho Falls, Idaho, Attorney for Debtor.

Jennifer DeHaan Cummins, Boise, Idaho, Attorney for Harry DeHaan.

*Introduction*

In the motion before the Court, chapter 12[1] debtor Silva Dairy, LLC

("Debtor") asks the Court to revoke its prior approval of the fee application

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

MEMORANDUM OF DECISION – 1

of Debtor's former counsel, Harry C. DeHaan ("DeHaan") and to require

that he disgorge all amounts paid to him for those fees.  Motion to Revoke

Approval of Application for Attorney Fees and for Disgorgement of Fees

Paid to Harry C. DeHaan, Dkt. No. 229 ("the Motion").  Debtor bases this

request on its assertion that DeHaan failed to make adequate disclosures of

the source of funds paid to him for a retainer, as well as allegations that he

forged the signatures of Debtor's principal on certain documents filed with

the Court.  *Id.*  DeHaan strenuously opposes the Motion, denying all its

material allegations.  Opposition to Motion, Dkt. No. 232.

Following an evidentiary hearing held on May 11, 2016, the Court

took the issues under advisement.  After due consideration of the evidence,

testimony, and arguments presented, as well as the parties' briefs, and the

applicable rules and law, this Memorandum sets forth the Court's findings

of fact and conclusions of law, and resolves the Motion.  Fed. R. Bankr. P.

7052; 9014.

### *Findings of Fact*

Debtor operates a dairy in Buhl, Idaho.  Its principal owners are

MEMORANDUM OF DECISION – 2

brothers Maximaino ("Max"), Anthony ("Tony"), Alberto ("John"), and

Heilo ("Eilo") Silva (collectively, "the Silvas"). Ex. 106. The dairy has been

operated in Buhl by members of the Silva family for more than twenty-five

years. Second Am. Ch. 12 Plan, Ex. 108. At all times relevant herein,

Debtor's dairy herd was housed and milked at a leased facility. *See* First

Am. Ch. 12 Plan, Dkt. No. 70, at p. 23.

The Silvas own land through another entity called Silva Land, LLC

("Silva Land"), in which they are the principals. On this approximately

440 acres, Silva Land raises corn, triticale, grain and hay. *Id*. Silva Land's

finances have been collectively managed via Silva Dairy.

Debtor milks approximately 700 cows. *Id*. As of April 1, 2011, when

its second amended chapter 12 plan was filed, approximately 250 of those

cows belonged to JT Livestock, an entity owned, at least in part, by Jack

McCall. *Id*. Beginning in May 2010, JT Livestock agreed to pay rent to

Silva Land for use of its dairy facility[2], as well as a separate management

---

[2] There is some confusion about which entity JT Livestock contracted with
to provide dairy space. The lease agreement memorializing the arrangement,
discussed below, is between JT Livestock and Silva Land. Ex. 109. However, the

MEMORANDUM OF DECISION – 3

fee to feed, care for, and milk the cows.[3]  Lease Agreement, Ex. 109.

Over the years, the Silvas, Silva Land and the Debtor have all needed to borrow money to fund operations.  For example, in October 2006, they, along with several other Silva-owned entities, executed a promissory note for $550,000 in favor of AgStar Financial Services, FLCA, acting as the agent for lender McFinney Agri-Finance, LLC ("McFinney").  Ex. 106.  As the Court understands it, Jack McCall owned an interest in McFinney, although the nature and extent of that interest is unclear.  In March 2009, the Silva borrowers again experienced cash flow issues and they executed

_____

confirmed plan provides that "J&T Livestock" pays rent to Debtor, rather than Silva Land.  Third Am. Ch. 12 Plan, Dkt. No. 100, at p. 6.  While it is not necessarily critical to its decision, the Court presumes the lease of the dairy space was between JT Livestock and Silva Land, which entity actually owned the property upon which the dairy was located.

[3]  The evidence is likewise unclear about which entity agreed to manage the JT Livestock herd.  While the management portion of the Lease Agreement suggests the Silvas would accomplish the task of managing JT Livestock's herd, the state court found that it was Debtor who agreed to manage McCall's herd, and in fact, did so.  Memorandum Opinion, Ex. 200, at pp. 3, 11, 16.  Moreover, the state court found there was no meeting of the minds concerning who was responsible to provide the management services, leaving Debtor with an unjust enrichment claim against JT Livestock and McCall.  Ex. 200 at p. 16 & n.7.  Again, as with the dairy lease, this Court need not resolve this disputed fact at this juncture.

MEMORANDUM OF DECISION – 4

another promissory note in favor of McFinney in the amount of $1,060,000.

*Id*.  As of the date of the bankruptcy filing in August 2010, the Silva

borrowers, including Debtor, still owed substantial sums on these notes.

When it became apparent that borrowing more and more money

was not the solution to the Silvas' collective financial problems, they

discussed the possibility of filing for bankruptcy.  Because they were

housing and managing his herd, near the end of July 2010, Max talked to

Jack McCall about the prospect of a bankruptcy filing.  McCall inquired

about who the Silvas were planning to use as their attorney, and when

Max indicated he did not know any bankruptcy attorneys, McCall told

him about DeHaan.  McCall then placed an introductory call to DeHaan,

and Max made an appointment to meet with him.

During their initial meeting, DeHaan discussed Debtor's options

under chapter 12 with Max.  He informed Max that, to pursue such a case,

DeHaan would need a retainer of $10,000 to begin work.  Not surprisingly,

the Silvas were cash-strapped, behind on loan payments, and could not

come up with such a retainer.  Max testified that he and DeHaan discussed

MEMORANDUM OF DECISION – 5

the possibility of asking McCall for the money, which is exactly what Max
did.  At a later meeting, McCall agreed to give Max the money for the
retainer, and McCall's wife wrote Max a check payable to "Max Silva" for
$10,000 on a JT Livestock bank account; she noted in the memo line of the
check that the money was for "facility rent".  Ex. 100.  In his mind, though,
Max considered the transaction to be more in the nature of a personal loan
which the Silvas could "work off" through managing JT Livestock's dairy
herd.  In contrast, DeHaan testified that he understood that the $10,000
given to Max by Mrs. McCall was for rent owed for housing the JT
Livestock herd.  Indeed, it is undisputed that JT Livestock had not paid any
facility rent to Debtor or Silva Land prior to this time, although the parties'
arrangement had only been in place for one month.  Thus, conceivably, as a
rent payment, the $10,000 could have reflected some rent already owed, as
well as an advance on rent to be incurred by JT Livestock in the future.

Max immediately delivered the check to DeHaan.  While DeHaan
testified it was his practice to accept payment for fees solely from the client,
and never from a third party, Max testified that DeHaan advised him he

MEMORANDUM OF DECISION – 6

should not deposit the funds in Debtor's bank because DeHaan was

concerned that the bank, one of Debtors' creditors, might seize the funds to

apply to its debts.  DeHaan disputes he gave such advice to Max.

Regardless, Max endorsed the check directly over to DeHaan, who took it

for the retainer.  DeHaan testified that he was comfortable accepting this

money because he believed the $10,000 was owed to one of the Silva

entities by JT Livestock, and that as their manager, Max was at liberty to

use the funds however he wished.

Apparently, DeHaan was not at all concerned that the retainer funds

originated with an entity owned at least in part by McCall, a potential

creditor in Debtor's impending bankruptcy case.  Though he was less than

clear on the point, DeHaan testified that he understood that an entity

called "Agri Access" had purchased McFinney's rights in the promissory

notes executed by Debtor, Silva Land, and the Silvas, and therefore, Agri

Access, not McCall, was the creditor.  DeHaan also testified that he was

unaware that Debtor was indebted to McCall at the time of the bankruptcy

filing, and that if he had known, he would not have accepted the retainer

MEMORANDUM OF DECISION – 7

check that he did, as it posed a possible conflict of interest.  The record

contains no information to support DeHaan's understanding on this point.

Debtor filed a chapter 12 petition on August 18, 2010.  Dkt. No. 1.

Along with other same-day filings, DeHaan filed an Application to Employ

Attorney, in which he represented that "[t]he debtor has paid the DeHaan

Law Office a retainer fee of $10.000,00 [sic] for services rendered or to be

rendered in this case."  Ex. 101.  His supporting declaration provided that

he had billed Debtor $3,944 for pre-petition services.  *Id.*  That same day,

DeHaan filed a Rule 2016(b) disclosure stating that Debtor had paid him a

$10,000 retainer.  Ex. 102.

On November 28, 2011, DeHaan filed a second Application for

Employment, Ex. 104, which the Court later approved, Dkt. No. 127.  That

application contained the same declaration found in the prior application

regarding the source of DeHaan's retainer.  Ex. 101.[4]

---

[4] Debtor perpetuated this statement of where the retainer funds
originated in an amendment to the Statement of Financial Affairs DeHaan
drafted and filed on behalf of the Debtor.  Dkt. No. 108 ("Debtors made a deposit
of $10,000 in Harry DeHaan's trust account . . . .")

MEMORANDUM OF DECISION – 8

On October 11, 2011, DeHaan filed an application for approval of

interim compensation requesting an award of fees totaling $35,150.01.  Ex.

110.  According to the application, of the $10,000 retainer, $6,000 remained,

which DeHaan sought to use to pay the approved fees and costs, while the

balance of the fees, $29,150.01, were to be paid through payments under

Debtor's chapter 12 plan.  *Id*.  After notice, and without objection from

Debtor, the application was granted and compensation and expenses

approved in the amount sought on January 13, 2012.  Dkt. No. 135.

During the case, chapter 12 trustee Forrest P. Hymas ("Trustee")

advised DeHaan that the various agreements existing between Debtor,

Silva Land, and others should be memorialized in writing so the respective

interests of Debtor and the other parties, and the terms of those contracts,

could be ascertained.  As relevant here, to accomplish this, DeHaan drafted

a number of contracts, including a Lease Agreement ("the Lease") in

December 2010 (although its effective date was to be June 1, 2010)

providing that JT Livestock would lease dairy facilities from Silva Land for

$10.50 per cow per month.  Ex. 109.  It also provided in a hand-written

MEMORANDUM OF DECISION – 9

space that JT Livestock would pay Max, Tony, and John Silva the total of

$1,000 per month as a management fee for caring for the JT Livestock herd

at the Silva Land facility.  *Id*.  Following its preparation, the Lease was

purportedly signed by Max and McCall at DeHaan's office, however, a

controversy exists concerning the terms and execution of the Lease on two

fronts.

First, Max testified that he did not, nor would he ever, agree to a

$1,000 per month fee for the Silvas' management of the JT Livestock

animals, as that was a completely inadequate sum for the work involved in

caring for a dairy herd.  And second, though the Lease appears to have

been signed by Max before a notary (DeHaan's paralegal) on December 2,

2010, Max provided convincing evidence to the Court showing that he

departed for Mexico from the Boise airport at 7:00 a.m. on the morning of

December 2, and thus, he did not sign the Lease as indicated.  Exs. 111, 112.

 Instead, Max contends that the $1,000 figure for the management fee was

inserted, and his signature on the Lease was forged, by DeHaan.  Max

testified that the first time he saw the Lease was in early 2013, when

MEMORANDUM OF DECISION – 10

Trustee forwarded a copy to him.  Max further alleges that his signature

was forged on Debtor's original chapter 12 plan, Ex. 107, but he

acknowledges that he did, in fact, sign the second amended chapter 12

plan, Ex. 108.[5]

    According to Max, and contrary to the Lease DeHaan drafted, no

specific management fee was agreed to by the Silvas and McCall for JT

Livestock.  Instead, the Silvas intended to manage the JT Livestock herd,

and that the value of their labor would be credited against the debt that

Debtor owed to JT Livestock or Jack McCall.  However, when that

arrangement did not work out, in August 2012, McCall removed his herd

from the Silva Land property, and state court litigation ensued.  In 2013,

Green River Ranches, LLC, another entity owned in part by Jack McCall,

sued the Silvas and Silva Land for an unpaid promissory note executed in

---

    [5] Of course, the Lease as written is between JT Livestock and Silva Land,
and therefore was not administered under any of the chapter 12 plans filed with
the Court, although it was attached to the second amended plan, Dkt. No. 80, as
well as the third amended plan, Dkt. No. 100.  The third amended plan was
ultimately confirmed by the Court.  Dkt. No. 113.

MEMORANDUM OF DECISION – 11

connection with the purchase of the Silva Land property.[6]  Ex. 200.   At

least two other actions were filed by McCall and/or entities in which he

had an ownership interest, against the Silvas and/or their entities.[7]  McCall

also prosecuted an action against Max Silva and Silva Dairy in state court

in 2013, seeking repayment of the $10,000 retainer.[8]  Ex. 201.  When the

state court rendered decisions unfavorable to the Silvas and Debtor

concerning the disputed management fees, on March 1, 2016, through new

counsel, Debtor filed the Motion.  Dkt. No. 229.

### *Conclusions of Law and Disposition*

The Motion alleges that the relief it seeks is authorized by § 105(a),

§ 329, § 330, Rules 2014(a), 2017, 9024[9], and Local Rule 2014.1(a)(2).

---

[6]  Twin Falls Case No. CV-13-1263.  Silva Dairy also signed the promissory note, but was not joined in the state court case on account of the bankruptcy filing.  Ex. 200.

[7]  *McCall v. Max Silva, et al.*, Case No. CV-13-3154; *McCall v. Silva Land, et al.*, Case No. CV-13-4732.  Ex. 200.

[8]  *McCall v. Max Silva, et al.*, Case No. CV-13-4728.

[9]  As will be seen from the discussion below, reliance on Rule 9024, which governs relief from a judgment or order, is unnecessary.

MEMORANDUM OF DECISION – 12

Specifically, Debtor seeks a "revocation" of the order entered by the Court approving the payment of fees earned by DeHaan representing Debtor in the chapter 12 case, and disgorgement of all fees previously paid to him, either via the retainer or through the confirmed chapter 12 plan.  As noted above, Debtor urges this relief is justified for two reasons: first, because DeHaan forged Max's signature on documents filed with the Court; and second, because DeHaan's disclosures surrounding the source of the $10,000 retainer he received were inadequate and inaccurate.   DeHaan denies that he forged Max's signatures and contends his fee disclosures were sufficient.

The Court will examine each issue in turn.

1.   <u>The Alleged Forgery</u>

Debtor contends that DeHaan forged Max's signature on at least two documents in connection with this case, and that his conduct constitutes grounds for revocation of the Court's order authorizing payment of his fees.  Specifically, Debtor alleges that Max's signature on the original chapter 12 plan filed with the Court, Ex. 107, as well as his signature on the

MEMORANDUM OF DECISION – 13

Lease, Ex. 109 (which was thereafter appended to versions of Debtor's

plan), were forged.

The Court accepts Max's version of the facts on this issue, at least in

part. Max credibly testified that the signatures on the two documents (*i.e.*

Debtor's original plan and the Lease) were not his.

A number of other signatures on documents filed with the Court

that the parties seemingly agree contain Max's authentic signature were

also admitted in evidence for comparison. Other circumstantial evidence

supports Max as well. Though no handwriting expert was called to testify,

the Court's admittedly untrained review of the undisputed documents

strongly suggests that Max did not sign the original chapter 12 plan or the

Lease.[10] Moreover, Max's signature on the original chapter 12 plan was

dated December 1, 2010. But DeHaan's own billing records shows that he

did not finish drafting that plan until December 2, 2010. Finally, while the

---

[10] The Court also believes Max when he testifies that he did not authorize anyone to fill in the space of the Lease to include a $1,000 per month management fee. But the record does not establish who may have penned this provision.

MEMORANDUM OF DECISION – 14

Lease purports to have been signed by Max on December 2, 2010, Max proved to the Court he was in transit to Mexico on that day.

On the other hand, while the Court can comfortably conclude that Max's signatures on the original plan and the Lease were not his, the evidence is insufficient to determine that it was DeHaan who forged them. Though the plan and the Lease were in DeHaan's control prior to being signed and filed with the Court, it is possible someone other than DeHaan signed Max's name to them, possibly a member of DeHaan's staff. But absent better evidence implicating DeHaan, the Court declines Debtor's invitation to sanction DeHaan through the loss of fees for the irregularities in these documents.

2. <u>Fee Disclosures</u>

Attorneys who represent debtors in reorganization cases must be disinterested and not hold interests that are adverse to those of their client, the bankruptcy estate. § 327(a). As such, payment of a debtor's attorney fees by a third party could give rise to a lack of disinterestedness, depending upon the connections of the third party to the debtor. To

MEMORANDUM OF DECISION – 15

ensure compliance with this directive, the Code and Rules require

affirmative disclosures concerning their fees, and the source of any

payments for those fees, by attorneys seeking to represent debtors.  For

example, the Code provides:

> Any attorney representing a debtor in a case under this title
> . . . shall file with the court a statement of the compensation
> paid or agreed to be paid . . . for services rendered or to be
> rendered in contemplation of or in connection with the case
> by such attorney, *and the source of such compensation.*

§ 329(a) (emphasis added).  Rule 2016(b) implements this Code provision.

It requires that:

> Every attorney for a debtor, wether or not the attorney applies
> for compensation, shall file and transmit to the United States
> trustee within 14 days after the order for relief . . . the
> statement required by § 329 of the Code . . . .

Moreover, the Code provides that the Court shall only approve the

employment of an attorney under § 327 upon submission of an application

which includes, *inter alia*, "any proposed arrangement for compensation,

and, to the best of the applicant's knowledge, all of the person's

connections with the debtor, creditors, any other party in interest . . . ."

MEMORANDUM OF DECISION – 16

Rule 2014(a).

Finally, the Rules require further disclosures when an attorney for a

chapter 12 debtor applies for approval of his compensation:

> An entity seeking interim or final compensation for services,
> or reimbursement of necessary expenses, from the estate shall
> file with the court an application setting forth a detailed
> statement of (1) the services rendered, time expended and
> expenses incurred, and (2) the amounts requested.  *An
> application for compensation shall include a statement as to what
> payments have theretofore been made or promised to the applicant
> for services rendered or to be rendered in any capacity whatsoever in
> connection with the case, the source of the compensation so paid or
> promised . . . .*

Rule 2016(a) (emphasis added).

Under these rules, as Debtor's counsel, DeHaan was required to

disclose, among other information, the source of his retainer.  He failed to

accurately and completely do so.  In his employment applications he filed

with the Court, as well as his Rule 2016(b) disclosure statement, DeHaan

represented to the Court that he received a $10,000 retainer *from Debtor*.

This statement was, at best, incorrect, and more likely a misrepresentation.

DeHaan knew the funds for his retainer originated with JT Livestock

MEMORANDUM OF DECISION – 17

or McCall; indeed, the check endorsed and given to him by Max was

written on a JT Livestock bank account.  DeHaan testified that he believed

that the money was for rent owed to Debtor by McCall, and that he

believed the retainer funds were being given to him by Max Silva as an

agent (*i.e.,* the manager) for Debtor.  However, this assertion stands in

contrast to DeHaan's repeated testimony that he concluded, after doing his

due diligence, that his client, Silva Dairy, was neither a creditor nor debtor

to Jack McCall or his entities.  As such, he could not have assumed the

$10,000 was in any way Debtor's money.[11]  Because Silva Land is the entity

which owns the land where the JT Livestock herd was to be housed and

cared for, the $10,000 either belonged to Silva Land, or at best, to the Silvas

as the herd managers for  Silva Land.  In no way can the evidence be

construed to show that the $10,000 belonged to the Debtor.  As such,

DeHaan's statements on documents he filed with the Court representing

he received the retainer from Debtor are false.

---

[11]  The state court found the $10,000 check to Max Silva was a rent
payment owed to Max Silva, Silva Land or Debtor.  It was unnecessary for the
state court to resolve that fact.  Ex. 201, p. 10.

MEMORANDUM OF DECISION – 18

The Ninth Circuit's decision in *Neben & Starrett, Inc. v. Chartwell Fin.
Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 880 (9th Cir. 1995) was factually
similar to this one.  There, the debtor's counsel disclosed to the bankruptcy
court that a retainer had been paid to him by the debtor, when in fact, it
came via a check from debtor's president drawn on his personal checking
account.  In highlighting the deficiencies in counsel's disclosures in the
bankruptcy case, the Ninth Circuit explained that, because the Code and
Rules impose an independent disclosure responsibility upon attorneys,
"failure to comply with the disclosure rules is a sanctionable violation,
even if proper disclosure would have shown that the attorney had not
actually violated any Bankruptcy Code provision or any Bankruptcy Rule"
and that "[e]ven a negligent or inadvertent failure to disclose fully relevant
information may result in a denial of all requested fees."  *Id.* at 880, 882.
As such, "[a lawyer] must at least disclose the facts of the transaction, as
those facts were known to the firm."  *Id.* at 882.  When false, incorrect or
incomplete disclosures are made in the bankruptcy case by counsel, the
Ninth Circuit has held that the "attorney's failure to obey the disclosure

MEMORANDUM OF DECISION – 19

and reporting requirements of the Bankruptcy Code and Rules gives the

bankruptcy court the discretion to order disgorgement of attorney's fees."

*Franke v. J.K. Tiffany, U.S. (In re Lewis)*, 113 F.3d 1040, 1045 (9th Cir. 1997);

*In re Park-Helena Corp.*, 63 F.3d at 880 ("failure to comply with the

disclosure rules is a sanctionable violation").

In this case, based upon the circumstances, the Court concludes that

DeHaan's defective disclosures about the source of his retainer were at

least inaccurate, and possibly just plain untrue, and that he clearly failed to

comply with the disclosure requirements of the Code and Rules.  To be

true to the purpose and spirit of the disclosure rules, DeHaan's conduct is

sanctionable.  While under the case law, the Court could require DeHaan

to disgorge all of the fees paid to him as Debtor's counsel in the

bankruptcy case, because only DeHaan's disclosures about the source of

the initial retainer were tainted, the Court concludes it should not disturb

post-confirmation payments made to DeHaan through the plan.  As such,

the Court denies Debtor's motion to revoke prior approval of DeHaan's fee

application and thereby to, effectively, deny DeHaan any payment for his

MEMORANDUM OF DECISION – 20

services.  However, in the exercise of its discretion, because he has violated the disclosure rules, the Court concludes DeHaan should  disgorge the $10,000 paid to DeHaan as a retainer, as to which proper disclosure was not made.

### *Conclusion*

There was inadequate evidence offered to show that DeHaan committed a forgery.  While Max's signatures on the original plan and the Lease were not his, the record does not show who signed his name to those documents.  However, the Court concludes the disclosures DeHaan made to the Court concerning the source of the $10,000 retainer he received in this case were false.  Those funds came from JT Livestock, one of Debtor's creditors, not from Debtor, as DeHaan represented in the employment applications and Rule 2016(b) disclosure statement. Accordingly, disgorgement of that retainer is warranted.

A separate order will be entered.

///

///

MEMORANDUM OF DECISION – 21

Dated:  June 21, 2016

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge